**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JACOB BURRIS, as Administrator of the | ) | |
| Estate of MAURICE L. BURRIS, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  09-3116 |
| | ) | |
| STEPHEN A. CULLINAN, MD, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

NOW COMES JACOB BURRIS as Administrator of the Estate of MAURICE L. BURRIS,

deceased, by and through his attorneys ALEXANDRA de SAINT PHALLE of LONDRIGAN,

POTTER & RANDLE, P.C. and JOSEPH J. MADONIA and pursuant for his Second Amended

Complaint against the Defendants STEPHEN A. CULLINAN, MD; HEALTH PROFESSIONALS,

LTD.; LEE ANNE BRAUER, R.N.; SANGAMON COUNTY SHERIFF'S DEPARTMENT; NEIL

WILLIAMSON, individually and in his official capacity as Sheriff of Sangamon County; TERRY

DURR, individually and in his official capacity as Superintendent of Sangamon County Jail; and

SANGAMON COUNTY, the Plaintiff states as follows:

**JURISDICTION**

1.      This action is brought pursuant to 42 U.S.C. §§ 1983 based upon the violation of the

civil rights of decedent *i.e.* the deprivation of a pretrial detainee's right to basic health services

guaranteed by the due process clause of the 14th Amendment to the United States Constitution.

Additional state law claims are brought pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/2

and the Survival Act, 755 ILCS 5/27-6. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1367.

## VENUE

2.      The violation of the decedent's civil rights took place within the Central District of Illinois, *i.e.* at the Sangamon County Jail, located in Springfield, Illinois.

## PARTIES

3.      Decedent, Maurice L. Burris,  was a resident of the City of Springfield at the time of his death. Plaintiff Jacob Burris was appointed as  Administrator of the Estate of Maurice L. Burris by the Circuit Court of Sangamon County on November 4, 2009.  A copy of the Letters of Administration is attached hereto and marked as Exhibit A. The Plaintiff is the natural adult son of the decedent and brings this action on behalf of the Estate of Maurice Burris and on behalf of himself and Kristy Burris, his sister and the only other next of kin of the decedent.

4.      Stephen A. Cullinan, MD, is and was at all times mentioned herewithin the Chief Medical Director of Health Professionals, Ltd (HPL), and a physician licensed to practice medicine in the State of Illinois.

5.      HPL is a corporation which contracted with Sangamon County to furnish medical care and physician services to inmates and detainees housed at the Sangamon County Jail beginning on December 1st, 2007 and continuing through August, 2008.

6.      Lee Anne Brauer, RN, is a Registered Nurse and Sangamon County employee and Sheriff's Department employee who was at all times mentioned herein, the medical director of the Sangamon County Jail.

7.      Neil Williamson, sued both individually and in his official capacity, is the Sheriff of Sangamon County, and as such is legally responsible for the  control and operation of the Sangamon

County Jail and for seeing to it that inmates and detainees receive adequate medical care.

8.      Terry Durr, sued both individually and in his official capacity, is the Superintendent of the Sangamon County Jail and in charge of the operation of the Sangamon County Jail.

9.      Sangamon County is the legal entity which contracted with HPL to furnish medical care for inmates and detainees at the Sangamon County Jail.

## BACKGROUND FACTS

10.     On November 24th, 2007, Maurice Burris was arrested and placed in the Sangamon County Jail.

11.     On December 1-4th, 2007, Maurice Burris was a pretrial detainee.

12.     Effective December 1st, 2007,  Sangamon County entered into a contract with HPL, for the provision of health care services to Sangamon County Jail inmates and detainees.  A copy of the contract is attached hereto as Exhibit B.

13.     Under the terms of the contract, HPL was obligated to provide the services of an on-call physician to the Sangamon County Jail 24/hours a day and seven days a week.  HPL was also obligated under the contract with Sangamon County to arrange and pay for the cost of emergency ambulance services and laboratory services for inmates and detainees.

14.     In addition, under the contract with Sangamon County, HPL was "to arrange and bear the cost of hospitalization for a COVERED PERSON, who in the opinion of the treating physician and/or HPL's CHIEF MEDICAL OFFICER requires hospitalization.  HPL shall be responsible for hospital costs with the annual aggregate cap of $50,000 per contract year."

15.     On the night of December 1st through 2nd, 2007, Maurice Burris started having severe stomach pain; he was vomiting blood and vomited all night long.

16.     On December 2nd, 2007, at approximately 9:38 a.m., Maurice Burris was examined by Christina Taylor, LPN at the Sangamon County Jail. In her note, Ms. Taylor recorded that Maurice Burris stated that he vomited all night, and he had a history of bleeding ulcers. Ms. Taylor observed *inter alia*, that Maurice Burris walked stooped over to the medical unit; he had a red forehead, facial grimacing, flushed skin, a temperature of 96.6, a heart rate of 140, respiratory rate of 40, a pulse ox reading of 97% on room air, pink, tinged vomitus, burning, cramping abdominal pain which increases upon standing.

17.     A normal heart rate for an adult is between 60-90 beats per minute and a normal respiratory rate is 14-18 breaths per minute.

18.     On December 2nd, 3rd and 4th, 2007, Lee Anne Brauer, RN, was on call for the Sangamon County Jail for any medical problems which might arise.

19.     On December 2nd, 2007, at approximately 9:38 a.m., Christina Taylor, LPN informed Lee Anne Brauer, RN, of the signs, symptoms, vital signs and medical history of Maurice Burris listed above in Paragraph 16.

20.     On December 2nd, 2007, Lee Anne Brauer, RN, knew that Maurice Burris' heart rate and pulse were dangerously high and met the definition of "critical" values for vital signs and created a serious risk of death if not investigated after a two (2) hour period.

21.     Recognized medical treatises define heart rates greater than 120 and respiratory rates exceeding 26 breaths per minute as "panic values".

22.     Despite these vital signs, Lee Anne Brauer, RN, refused to come in and examine Maurice Burris on December 2nd, 2007.

23.     On December 2nd, 2007, Lee Anne Brauer, RN, called Stephen Cullinan, MD, at approximately 9:40 a.m. and provided him with the medical history and signs and symptoms outlined in Paragraph 16 above and obtained medication orders for Mylanta, Zantac and Benadryl and orders to transfer Maurice Burris to "med 4 for monitoring". Dr. Cullinan informed Lee Anne Brauer, RN that Maurice Burris would be "fine".

24.     At approximately 4:30 p.m., on December 2nd, 2007, Sergeant Guy E. Bouvet observed Maurice Burris to be in "extreme pain", his skin clammy to touch and sweating. Sergeant Guy E. Bouvet found Maurice Burris's stomach to be "hard to the touch." Sergeant Guy E. Bouvet notified Lee Anne Brauer, RN of these findings and was advised to have an LPN to check on Maurice Burris' condition when the LPN arrived that evening for her shift.

25.     At approximately 4:30 p.m., on December 2nd, 2007, Christina Taylor, LPN, observed Maurice Burris to be complaining of abdominal burning "like fire", burning upon urination and to have vital signs of blood pressure 114/80, temperature 100.7, heart rate 142, respiratory rate 48 and pulse ox of 95%. Ms. Taylor also noted that Maurice Burris's abdomen was firm to touch and bowel sounds heard in the lower quadrants only, and the patient was again stooped over and groaning with pain.

26.     At the time and place mentioned above in Paragraph 25, Christina Taylor, LPN, again notified Lee Anne Brauer, RN of the above findings and was informed to check back on Maurice Burris within an hour.

27.     At approximately 5:08 p.m., Christina Taylor, LPN, checked back on Maurice Burris and found him to be vomiting and informed Lee Anne Brauer, RN, of that fact.

28.     Lee Anne Brauer, RN, again refused to come in and evaluate Maurice Burris after being advised of the findings listed above in Paragraphs 24, 25 and 27.

29.     Lee Anne Brauer, RN, called Stephen Cullinan, MD, at approximately 5:15 p.m. and informed him of the findings in paragraph 24, 25 and 27 and received no new orders. Dr. Stephen Culllinan again advised Lee Anne Brauer, RN, at that time that Maurice Burris would be "fine".

30.     At 6:30 p.m. on December 2nd, 2007, Maurice Burris was noted by Christina Taylor, LPN, to be complaining of "shocking pain in the left shoulder, with numb fingers"; his heart rate was 115 and his pulse oxygenation level was now below normal.

31.     At 7:30 p.m., on December 2nd, 2007 surveillance video of Maurice Burris shows Maurice Burris apparently vomiting and alternately in bed clutching his abdomen or his hands clasped together over his head.

32.     At 7:30 p.m., on December 2nd, 2007, LPN Christina Taylor wrote that Maurice Burris was "resting quietly" with no signs or symptoms of distress.

33.     On December 3rd, 2007, at approximately 7 a.m. Maurice Burris was "examined" by Stephen Cullinan, MD, who assessed Maurice Burris as "walking, stooped forward" having and tender rectus muscle and "possible muscle wall pain with dyspepsia" and ordered urine ketones to be obtained. Dr. Stephen Cullinan estimated the pulse to be 100 and respiratory rate to be 16.

34.     On December 3rd, 2007, surveillance videos show Maurice Burris as not eating all day long, making repeated trips to the sink where he was either vomiting or having dry heaves, walking stooped over and clutching his abdomen while in bed and being exceedingly restless.

35.     On December 4th, 2007, at 1:00 a.m., Maurice Burris advised Sergeant Bill Smith he was having a bleeding ulcer and was complaining of severe pain.

36.     At the same time, Maurice Burris advised Sergeant Bill Smith that his stomach was burning and very hard to the touch.  His heart rate was again at "critical" levels of 135.

37.     On December 4th, 2007 at approximately 1:00 a.m., Sergeant Bill Smith advised Lee Anne Brauer, RN, of this condition.

38.     When Lee Anne Brauer, RN, was contacted by Sergeant Bill Smith at 1:00 a.m. on December 4th, 2007, and told of his condition, Lee Anne Brauer, RN, told Sergeant Bill Smith that Burris was "fine" and she would see him in the morning.

39.     On December 4th, 2007, at approximately 7:00 a.m., Lee Anne Brauer, RN, obtained vital signs on Maurice Burris of a heart rate of 138, respiratory rate of 44, a temperature of 95, and a pulse ox rate of 94%.

40.     The heart rate and respiratory rates listed above were again "critical values" and the temperature and pulse ox rates were below normal.

41.     On December 4th, 2007, at approximately 7:00 a.m., Lee Anne Brauer, RN, advised Dr. Stephen Cullinan of the vital signs and Maurice Burris's condition.  Lee Anne Brauer, RN, received orders from Stephen Cullinan, MD, to get a CBC and a chem 20 (basic blood work).   Lee Anne Brauer, RN, failed to draw the blood for the lab test because Health Professionals, Ltd., had not yet delivered to the jail supplies needed to carry out the order.

42.     On December 4th, 2007, at approximately 7:00 a.m., Lee Anne Brauer, RN, informed Dr. Stephen Cullinan that she could not perform the orders because the supplies were unavailable.  Dr. Stephen Cullinan then informed Lee Anne Brauer, RN, that Maurice Burris would be fine and not to worry about it.

43.    At 9:15 a.m. on December 4th, 2007, Lee Ann Brauer, RN, evaluated Maurice Burris again and observed no change in the dangerously high vital signs.

44.    On December 4th, 2007, at approximately 9:20 a.m., the jail staff turned down the lights because Maurice Burris was so restless.

45.    On December 4th, 2007, at approximately 10:04 a.m., surveillance videos indicate that Maurice Burris collapsed on to the floor of the cell by the toilet, but no one noticed his distress.

46.    Thereafter, surveillance videos Maurice Burris repeatedly fell onto his bed for the next 45 (forty-five) minutes.

47.    On December 4th, 2007, at approximately 10:56 a.m., Maurice Burris collapsed again on to the floor knocking over a bedside table.

48.    Very shortly thereafter, on December 4th, 2007, Maurice Burris's arms and legs began to mottle and no pulse ox was obtainable.

49.    After 11:00 a.m. and after the conditions noted above were observed, on December 4th, 2007, Lee Anne Brauer, RN, had to be asked by jail staff three times before she would call for an ambulance.

50.    At approximately 11:03 a.m., Maurice Burris was noted to have pupils which were fixed, his body limp, his color gray. His heart rate went into an agonal rhythm, and Maurice Burris developed a cardiac arrest.

51.    Maurice Burris was taken to St. John's Hospital at approximately 11:22 a.m. on December 4th, 2007.

52.    At St. John's Hospital, Maurice Burris was diagnosed with an "acute abdomen," septic shock, cardiac arrest, a large amount of feculent material was found in the abdomen; he had

a perforated ulcer and unrecoverable anoxic brain injury.

53.    Maurice Burris died at St. John's Hospital on December 12th, 2007, as a result of the anoxic brain injury resulting from lack of oxygen shortly before, during and after the cardiac arrest occurring at the Sangamon County Jail.

54.    Had Maurice Burris been timely transferred to St. John's Hospital on December 4th, 2007, Maurice Burris could have received a CT scan to definitively diagnose his perforated ulcer and surgery to treat his perforated ulcer which would have prevented his death.

## COUNT I
(Stephen Cullinan, MD, § 1983)

55.    This count is brought pursuant to 42 USC § 1983 for deprivation of Maurice Burris' 14th Amendment rights to basic health care services and jurisdiction is based on 42 USC § 1331.

56.    At all times mentioned herein, Stephen Cullinan, MD, was the Chief Medical Director of HPL and was the physician on-call for the Sangamon County Jail during the period December 2nd through December 4th, 2007.

57.    By virtue of his position as Chief Medical Director of HPL, and his status as the designated on-call HPL physician for the provision of medical services at the Sangamon County jail from December 2nd through December 4th, 2007, and the HPL contract, all acts and omissions of Stephen Cullinan, MD, mentioned herein were carried out under color of state law.

58.    On December 2nd, 3rd and 4th, 2007, the Defendant Stephen Cullinan, MD, by virtue of the contract entered into between Sangamon County and HPL and by HPL's own policies, was the physician responsible for all medical care provided to detainees at the Sangamon County Jail.

59.    In his capacity as medical director of HPL. Defendant Stephen Cullinan, MD, approved clinical protocols which defined "critical vital signs" as pulses greater than 120 and

respiratory rates greater than 25. In these protocols, Stephen Cullinan, M.D. further specified that

a physician should be notified immediately of "critical values of vital signs" and that critical values

of vital signs "should be rechecked every 2 (two) hours until the return to normal or as otherwise

ordered by a physician."

60.     On December 2nd and on December 4th, 2007, Defendant Stephen Cullinan, MD, was

advised that Maurice Burris had critical values of vital signs at approximately 9:30 a.m. and 5:00

p.m. on December 2nd, 2007, and at approximately 7:00 a.m on December 4th, 2007.

61.     At the same times as alleged in the preceding paragraph, Defendant Stephen Cullinan,

MD, was advised of the conditions listed in paragraphs 16, 24, 25, 30, 36 and 39 of this complaint.

62.     At a minimum on December 2nd and December 4th, 2007, Maurice Burris had need

for frequent vital sign monitoring, laboratory tests, radiological services and evaluation by a surgeon

in order to avoid serious jeopardy to his health.

63.     Stephen Cullinan, M.D. knew that the only way that any of the services listed above

could be provided to Maurice Burris was to transfer him to a local hospital for evaluation and

treatment.

64.     Stephen Cullinan, M.D. has acknowledged that Maurice Burris's vital signs set off

"alarm bells" and "something was really the matter."

65.     Stephen Cullinan, M.D. adopted a policy that a detainee could not be moved to a local

hospital unless it was a "true emergency" with life limb, or eye sight in jeopardy requiring immediate

dispatch to the hospital under the 911 emergency dispatch system.

66.     That during the period between December 2nd and December 4th, 2007, up through

11:00 a.m., notwithstanding his obligation to provide basic medical care to Maurice Burris, the

Defendant Stephen Cullinan, M.D., was deliberately indifferent to securing Maurice Burris' rights

to adequate medical care by committing one or more of the following acts:

> a.     Refused to order that Maurice Burris be transferred to a local hospital for medical evaluation and treatment.
>
> b.     Failed to order that Maurice Burris be transferred to a local hospital for medical evaluation and treatment.
>
> c.     Failed to obtain Maurice Burris' blood pressure and temperature on December 3, 2007.
>
> d.     Estimated Maurice Burris' pulse and respiratory rate rather than obtain an accurate measurement of those vital signs on December 3, 2007.
>
> e.     Failed to advise the nursing staff at the Sangamon County Jail to check Maurice Burris' vital signs on December 3, 2007.
>
> f     Refused to treat Maurice Burris other than to provide him Mylanta, Zantac and Benedryl when it was clear that he was suffering a serious medical condition that required more than over the counter medication.
>
> g.     Failed to treat Maurice Burris other than to provide him Mylanta, Zantac and Benedryl when it was clear that he was suffering a serious medical condition that required more than over the counter medication.
>
> h.     Adopted and implemented policies that put detainees such as Maurice Burris at great risk.

67.     That as a direct and proximate result of one or more of the foregoing acts, Maurice

Burris's perforated duodenal ulcer went undiagnosed and untreated resulting in massive peritonitis,

cardiac arrest and death on December 12th, 2007.

68.     That as a direct and proximate result of the acts set forth in paragraph 66 above

Maurice Burris suffered excruciating pain prior to his death and after his death, his next of kin have

lost the services, earnings, society and companionship of their father and the estate of Maurice Burris

has become liable for funeral and burial expenses and medical expenses which were incurred after

Maurice Burris was belatedly transferred to Saint John's Hospital.

WHEREFORE, Plaintiff JACOB BURRIS, as Administrator of the Estate of MAURICE L. BURRIS, deceased, requests judgment against the Defendant STEPHEN A. CULLINAN, MD, in an amount which is sufficient to compensate the Estate of Maurice Burris and the next of kin for their loss, punitive damages, and attorneys' fees and costs pursuant to 42 USC § 1988.

## PLAINTIFF DEMANDS TRIAL BY JURY

## COUNT II
### (Stephen Cullinan, MD, State Law, Medical Negligence)

1-54.   The Plaintiff repeats and realleges Paragraphs 1 through 54 of Count I as and for Paragraphs 1 - 54 of Count II.

55.   Jurisdiction for this count is based on supplemental jurisdiction, 28 USC § 1367 because this count is brought pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/2 and pursuant to the Illinois Survival Act 755 ILCS 5/27-6 on facts which arise out of the same transaction as set forth in Count I.

56.   At all times mentioned herein, the Defendant Stephen Cullinan, MD, was a physician licensed to practice medicine in the State of Illinois.

57.   The decedent Maurice Burris became a patient of the Defendant Stephen Cullinan, MD, on December 2nd, 2007, and remained as a patient of the Defendant Stephen Culllinan, MD until his transfer to St. John's Hospital on December 4th, 2007.

58.   On December 2nd and December 4th, 2007, the Defendant Stephen Cullinan, MD, was advised that Maurice Burris had critical values of vital signs at approximately 9:30 a.m. and 5:00 p.m. on December 2nd, 2007, and at approximately 7:00 a.m on December 4th, 2007.

59.     At the same times alleged in the preceding paragraph, the Defendant Stephen Cullinan, MD, was advised of the conditions listed in paragraphs 16, 24, 25, 30, 36 and 39 of this complaint.

60.     At a minimum on December 2nd and on December 4th, 2007, Maurice Burris had need for frequent vital sign monitoring, laboratory tests, radiological services and evaluation by a surgeon in order to avoid serious jeopardy to his health.

61.     That notwithstanding his duty to act in accordance with the standards of care which would be provided by a reasonably careful medical doctor in similar circumstances the Defendant Stephen Cullinan committed one or more of the negligent following acts or omissions during the period from December 2nd up through December 4, 2007, at 11:00 a.m.:

   a.     Failed to order that Maurice Burris be transferred to a local hospital for medical evaluation and treatment.

   b.     Failed to obtain Maurice Burris' blood pressure and temperature on December 3, 2007.

   c.     Estimated Maurice Burris' pulse and respiratory rate rather than obtain an accurate measurement of those vital signs on December 3, 2007.

   d.     Failed to advise the nursing staff at the Sangamon County Jail to check Maurice Burris' vital signs on December 3, 2007.

   e.     Failed to treat Maurice Burris other than to provide him Mylanta, Zantac and Benedryl when it was clear that he was suffering a serious medical condition that required more than over the counter medication.

   f.     Adopted and implemented policies that put detainees such as Maurice Burris at great risk

62.     That as a direct and proximate result of one or more of the foregoing acts, Maurice Burris's perforated duodenal ulcer went undiagnosed and untreated resulting in massive peritonitis, cardiac arrest and death on December 12th, 2007.

63.     That as a direct and proximate result of the acts set forth in paragraph 62 above, Maurice Burris suffered excruciating pain prior to his death and after his death, his next of kin have lost the services, earnings, society and companionship of their father and the estate of Maurice Burris has become liable for funeral and burial expenses and medical expenses which were incurred after Maurice Burris was belatedly transferred to Saint John's Hospital.

64.     Pursuant to 735 ILCS 5/2-622, Plaintiff attaches an affidavit and report hereto and marks them as Exhibits C and D respectively.

WHEREFORE, Plaintiff JACOB BURRIS, as Administrator of the Estate of MAURICE L. BURRIS, deceased, requests judgment against the Defendant STEPHEN A. CULLINAN, MD in an amount which is sufficient to compensate the Estate of Maurice Burris and the next of kin for their loss and costs.

**PLAINTIFF DEMANDS TRIAL BY JURY**

## COUNT III
### (HPL § 1983)

1-54.   The Plaintiff repeats and realleges Paragraphs 1 through 54 of Count I as and for Paragraphs 1 - 54 of Count III.

55.     This count is brought pursuant to 42 USC § 1983 for deprivation of Maurice Burris' 14th Amendment rights to basic health care services and jurisdiction is based on 42 USC § 1331.

56.     At all times mentioned herein, Stephen Cullinan, MD, was the Chief Medical Director of HPL and was the physician on-call for the Sangamon County Jail during the period December 2nd through December 4th, 2007.

57.     At all times mentioned herein, the Defendant Stephen Cullinan, MD, was acting within the scope and course of his employment with HPL.

58.    At all times mentioned herein, the Defendant Stephen Cullinan, MD, was a person with final decision making authority for HPL in that he was the medical director of HPL and the person who approved of all of HPL's policies and procedures regarding transfer of an inmate or a detainee for medical care.

59.    By virtue of its contract with Sangamon County to furnish medical services to inmates and detainees, all acts and omissions of HPL set forth herein were carried out under color of state law.

60.    On December 2nd, 3rd and 4th, 2007, the Defendant Stephen Cullinan, MD, by virtue of the contract entered into between Sangamon County and HPL and by HPL's own policies, was the physician responsible for all medical care provided to detainees at the Sangamon County Jail.

61.    In his capacity as medical director of HPL, the Defendant Stephen Culllinan, MD, approved clinical protocols which defined "critical vital signs" as pulses greater than 120 and respiratory rates greater than 25. In these protocols, Stephen Cullinan, M.D. further specified that a physician should be notified immediately of "critical values of vital signs" and that critical values of vital signs "should be rechecked every 2 (two) hours until the return to normal or as otherwise ordered by a physician."

62.    On December 2nd and on December 4th, 2007, the Defendant Stephen Cullinan, MD, was advised that Maurice Burris had critical values of vital signs at approximately 9:30 a.m. and 5:00 p.m. on December 2nd, 2007, and at approximately 7:00 a.m on December 4th, 2007.

63.    At the same times alleged in the preceding paragraph, the Defendant Stephen Cullinan, MD, was advised of the conditions listed in paragraphs 16, 24, 25, 30, 36 and 39 of this complaint.

64.    At a minimum on December 2nd and on December 4th, 2007, Maurice Burris had need for frequent vital sign monitoring, laboratory tests, radiological services and evaluation by a surgeon in order to avoid serious jeopardy to his health.

65.    Stephen Cullinan, M.D. knew that the only way that any of the services listed above could be provided to Maurice Burris was to transfer him to a local hospital for evaluation and treatment.

66.    Stephen Cullinan, MD, has acknowledged that Maurice Burris's vital signs set off "alarm bells" and "something was really the matter."

67.    Stephen Cullinan, M.D. and HPL adopted a policy that a detainee could not be moved to a local hospital unless it was a "true emergency" with life limb, or eye sight in jeopardy requiring immediate dispatch to the hospital under the 911 emergency dispatch system.

68.    That during the period between December 2nd and December 4th, 2007, up through 11:00 a.m., notwithstanding its obligation to provide basic medical care to Maurice Burris, the Defendant HPL through its agent Stephen Cullinan, MD, was deliberately indifferent to securing Maurice Burris' rights to adequate medical care by committing one or more of the following acts:

a.    Refused to order that Maurice Burris be transferred to a local hospital for medical evaluation and treatment.

b.    Failed to order that Maurice Burris be transferred to a local hospital for medical evaluation and treatment.

c.    Failed to obtain Maurice Burris' blood pressure and temperature on December 3, 2007.

d.    Estimated Maurice Burris' pulse and respiratory rate rather than obtain an accurate measurement of those vital signs on December 3, 2007.

e.    Failed to advise the nursing staff at the Sangamon County Jail to check Maurice Burris' vital signs on December 3, 2007.

f.      Refused to treat Maurice Burris other than to provide him Mylanta, Zantac and Benedryl when it was clear that he was suffering a serious medical condition that required more than over the counter medication.

g.      Failed to treat Maurice Burris other than to provide him Mylanta, Zantac and Benedryl when it was clear that he was suffering a serious medical condition that required more than over the counter medication.

h.      Adopted and implemented policies that put detainees such as Maurice Burris at great risk.

69.     That as a direct and proximate result of one or more of the foregoing acts, Maurice Burris's perforated duodenal ulcer went undiagnosed and untreated resulting in massive peritonitis, cardiac arrest and death on December 12, 2007.

70.     That as a direct and proximate result of the acts set forth in paragraph 68 above, Maurice Burris suffered excruciating pain prior to his death and after his death his next of kin have lost the services, earnings , society and companionship of their father and the estate of Maurice Burris has become liable for funeral and burial expenses and laye medical expenses which were incurred after Maurice Burris was belatedly transferred to Saint John's Hospital.

WHEREFORE, Plaintiff JACOB BURRIS, as Administrator of the Estate of MAURICE L. BURRIS, deceased, requests judgment against the Defendant HPL in an amount which is sufficient to compensate the Estate of Maurice Burris and the next of kin for their loss, punitive damages and attorneys' fees and costs pursuant to 42 USC § 1988.

## PLAINTIFF DEMANDS TRIAL BY JURY

## COUNT IV
(HPL, state law, medical negligence)

1-54.    The Plaintiff repeats and realleges Paragraphs 1 through 54 of Count I as and for Paragraphs 1 - 54 of Count IV.

55.    Jurisdiction for this count is based on supplemental jurisdiction 28 USC § 1367 because this count is brought pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/2 and pursuant to the Illinois Survival Act 755 ILCS 5/27-6 on facts which arise out of the same transaction as set forth in Count III.

56.    At all times mentioned herein, the Defendant Stephen Cullinan, MD, was a physician licensed to practice medicine in the State of Illinois.

57.    At all times mentioned herein, the Defendant Stephen Cullinan, MD, was acting within the scope and course of his employment with the Defendant HPL.

58.    The decedent Maurice Burris became a patient of the Defendant Stephen Cullinan, MD, on December 2nd, 2007, and remained as a patient of the Defendant Stephen Cullinan, MD, until his transfer to St. John's Hospital on December 4th, 2007.

59.    On December 2nd and December 4th, 2007, the Defendant Stephen Cullinan, MD, was advised that Maurice Burris had critical values of vital signs at approximately 9:30 a.m. and 5:00 p.m. on December 2nd, 2007, and at approximately 7:00 a.m on December 4th, 2007.

61.    At the same times alleged in the preceding paragraph, the Defendant Stephen Cullinan, MD, was advised of the conditions listed in paragraphs 17, 26, 27, 32, 36 and 39 of this complaint.

62.    At a minimum on December 2nd and on December 4th, 2007, Maurice Burris had need for frequent vital sign monitoring, laboratory tests, radiological services and evaluation by a surgeon in order to avoid serious jeopardy to his health.

63.     That notwithstanding its duty to act in accordance with the standards of care which

would be provided by a reasonably careful medical doctor in similar circumstances, the Defendant

HPL, through its agent Stephen Cullinan, MD, committed one or more of the following acts or

omissions during the period between December 2, 2007 and December 4, 2007, up to 11:00 a.m.:

a.     Failed to order that Maurice Burris be transferred to a local hospital for medical evaluation and treatment.

b.     Failed to obtain Maurice Burris' blood pressure and temperature on December 3, 2007.

c.     Estimated Maurice Burris' pulse and respiratory rate rather than obtain an accurate measurement of those vital signs on December 3, 2007.

d.     Failed to advise the nursing staff at the Sangamon County Jail to get vital signs on December 3, 2007.

e.     Failed to treat Maurice Burris other than to provide him Mylanta, Zantac and Benedryl when it was clear that he was suffering a serious medical condition that required more than over the counter medication.

f.     Adopted and implemented policies that put detainees, such as Maurice Burris, at great risk

g.     Provided Dr. Cullinan with an employment contract which gave him a direct financial incentive to minimize care given to detainees.

64.     That as a direct and proximate result of one or more of the foregoing acts, Maurice

Burris's perforated duodenal ulcer went undiagnosed and untreated resulting in massive peritonitis,

cardiac arrest and death on December 12th, 2007.

65.     That as a direct and proximate result of the acts set forth in paragraph 63 above,

Maurice Burris suffered excruciating pain prior to his death and after his death his next of kin have

lost the services, earnings, society and companionship of their father and the estate of Maurice Burris

has become liable for funeral and burial expenses and medical expenses which were incurred after

Maurice Burris was belatedly transferred to Saint John's Hospital.

66.     Pursuant to 735 ILCS 5/2-622, Plaintiff attaches an affidavit and report hereto and marks them as Exhibit C and D respectively.

WHEREFORE, Plaintiff JACOB BURRIS, as Administrator of the Estate of MAURICE L. BURRIS, deceased, requests judgment against the Defendant HEALTH PROFESSIONALS, LTD. in an amount which is sufficient to compensate the Estate of Maurice Burris and the next of kin for their loss and costs.

## PLAINTIFF DEMANDS TRIAL BY JURY

## COUNT V
### (Lee Anne Brauer, RN, § 1983)

1-54.   The Plaintiff repeats and realleges Paragraphs 1 through 54 of Count I as and for Paragraphs 1 - 54 of Count V.

55.     This count is brought pursuant to 42 USC § 1983 for deprivation of Maurice Burris' 14th Amendment rights to basic health services and jurisdiction is based on 42 USC § 1331.

56.     At all times mentioned herein, Lee Anne Brauer, RN, was an employee of Sangamon County and the Sangamon County Sheriff's Department, and medical director of the Sangamon County Jail.

57.     All acts alleged herein were committed by Lee Anne Brauer, RN, under color of state law.

58.     On December 2nd, 3rd and 4th, 2007, Lee Anne Brauer, RN, was the nurse in charge of providing all medical care to inmates and detainees at the Sangamon County Jail.

59.     Under the written policies and procedures of Chapter XII of the Sangamon County Jail and Sheriff's Department in effect in early December 2007, it was Lee Anne Brauer, RN's

responsibility to provide care for an inmate with an acute illness which could not be deferred until the next scheduled sick call. If adequate care for an acutely ill inmate could not be had within the Sangamon County Jail, it was Lee Anne Brauer, RN's, responsibility to transfer the inmate to a local hospital.

60.   In the course of her employment in November 2007, Lee Anne Brauer, RN, received various policies and procedures from HPL defining various protocols to be followed at the Sangamon County Jail beginning on December 1st, 2007. Among those protocols was a protocol entitled "Critical Vital Signs." This protocol defined as "Critical Vital Signs" pulses greater than 120 and respiratory rates greater than 25. The protocol further specified that a physician should be notified immediately of "critical values of vital signs" and that critical values of vital signs "should be rechecked every 2 (two) hours until they return to normal or as otherwise ordered by a physician."

61.   On December 2nd through 4th, 2007, Defendant Lee Anne Brauer, RN, knew that the Sangamon County Jail had neither the facilities nor the staff to obtain vital signs every two hours and that if an inmate required this type of monitoring, the detainee would have to be transferred to a hospital.

62.   On December 2nd and on December 4th, 2007, Lee Anne Brauer, RN, was advised that Maurice Burris had the clinical conditions listed in paragraphs 16, 24, 25, 30, 36 and 39 of this complaint.

63.   On December 2nd and 4th, 2007, Lee Anne Brauer, RN, knew that an inmate or detainee who had "critical" vital signs for longer than a two hour period, whose cause was not investigated faced a serious risk of dying. Lee Anne Brauer, RN, also knew that Maurice Burris' respiratory rates were extraordinarily high.

64.    That notwithstanding her duty to provide adequate medical care, the Defendant Lee Anne Brauer, RN, was deliberately indifferent to securing Maurice Burris' rights to adequate medical care by:

a.    Failing to inform Dr. Cullinan at 7:00 a.m. on December 4, 2007 that she thought that Maurice Burris should be transferred to the hospital.

b.    Failing to inform Dr. Cullinan on December 4, 2007 at 7 a.m. of what Maurice Burris' vital signs were at 1:00 a.m.

c.    Failing to provide Dr. Cullinan with a complete picture of Maurice Burris' condition at December 4, 2007 at 7 a.m.

d.    Failing to transfer Maurice Burris to St. John's Hospital at any time between 7:00 a.m. and 10:30 a.m. on December 4, 2007.

e.    Failing to call Dr. Cullinan again on December 4, 2007, at 1:00 a.m., and between 9:15 a.m. and 10:45 a.m. to advise him of Maurice Burris' continued critical vital signs.

f.    Failing to check Maurice Burris' abdomen on December 4th despite knowing of his history of bleeding ulcers and being advised that Maurice Burris was complaining of a very hard abdomen.

g.    Failing to periodically monitor Maurice Burris' medical condition and vital signs on December 3, 2007.

65.    That as a direct and proximate result of one or more of the foregoing acts, Maurice Burris' perforated duodenal ulcer went undiagnosed and untreated resulting in massive peritonitis, cardiac arrest and death on December 12th, 2007.

66.    That as a direct and proximate result of the acts set forth in paragraph 64 above, Maurice Burris suffered excruciating pain prior to his death and after his death his next of kin have lost the services, earnings, society and companionship of their father and the estate of Maurice Burris has become liable for funeral and burial expenses and medical expenses which were incurred after Maurice Burris was belatedly transferred to Saint John's Hospital.

WHEREFORE, Plaintiff JACOB BURRIS, as Administrator of the Estate of MAURICE L. BURRIS, deceased, requests judgment against the Defendant LEE ANNE BRAUER, RN, in an amount which is sufficient to compensate the Estate of Maurice Burris and the next of kin for their loss and attorneys' fees and costs pursuant to 42 USC § 1988.

## PLAINTIFF DEMANDS TRIAL BY JURY

## COUNT VI
(Neil Williamson, Terry Durr, Sangamon County Sheriff's Department, Sangamon County § 1983)

1-54.    The Plaintiff repeats and realleges Paragraphs 1 through 54 of Count I as and for Paragraphs 1 - 54 of Count VI.

55.    This count is brought pursuant to 42 USC § 1983 for deprivation of Maurice Burris' 14th Amendment rights to basic health services and jurisdiction is based on 42 USC § 1331.

56    All acts alleged herein were committed under color of state law.

57.    Pursuant to their respective duties as Sheriff of Sangamon County and Jail Superintendent, Neil Williamson and Terry Durr adopted certain written medical policies requiring *inter alia*, that adequate medical care be made available for inmates with an acute medical illness at the Sangamon County Jail on a 24 (twenty-four) hour basis and that for inmates or detainees whose health care needs could not be provided on site at the Sangamon County Jail, the Medical Director of the Sangamon County Jail, *i.e.*, Lee Anne Brauer, RN, was to transfer the inmate or detainee to a local hospital emergency room by ambulance for evaluation and treatment.

58.    To carry out their responsibilities to furnish medical care to inmates or detainees at the Sangamon County Jail, the Defendants recommended that Sangamon County enter into a contract with HPL to furnish physician services to inmates or detainees.

59.     Under that contract, HPL agreed to bear the costs of all expenses involved in the transfer of an inmate to the hospital and the first $50,000.00 of medical expenses involved in any hospitalization. Also under the contract, HPL's responsibility to become responsible for the payment of ambulance service and hospitalization expenses was limited to those inmates who in the opinion of the HPL's treating physician or chief medical officer requires hospitalization.

60.     Following implementation of this contract, Neil Williamson and Terry Durr adopted an unwritten policy that no one left the Sangamon County Jail without the consent of an HPL physician.

61.     In November 2007, the Defendants Terry Durr and Neil Williamson were advised that it was HPL's policy that no one could be transferred to a local hospital unless it was a "true emergency" with life, limb or eye sight in jeopardy requiring immediate dispatch to the hospital under the 911 emergency dispatch system.

62.     As a direct and proximate result of the adoption of the policy set forth in paragraph 60 and because of their knowledge of the allegations of paragraph 61, the Defendants Neil Williamson and Terry Durr knew that inmates and detainees who had an acute illness and who had an urgent need for medical attention which could not be provided at the Sangamon County Jail would not have their medical needs met until it was way too late in the course of their illness to provide adequate and effective medical care.

63.     On December 2nd and 4th, 2007, Maurice Burris had critical levels of vital signs as set forth in paragraphs 16, 25, 36 and 39 of this complaint and was severely ill as described in paragraphs 16, 24, 25, 30, 36 and 39 of this complaint.

64.     Because of his critical levels of vital signs and other symptoms described above, Maurice Burris was in urgent need of being transferred to a local hospital for evaluation and treatment.

65.     That notwithstanding their duty to provide adequate medical care to inmates and detainees, the Defendants Neil Williamson, both personally and in his official capacity, Terry Durr, the Sangamon County Sheriff's Department, and Sangamon County were deliberately indifferent to securing the rights to basic medical care for any inmate with an acute illness including Maurice Burris because they:

    a.     failed to provide proper instruction and guidance to Lee Anne Brauer, RN, to inform her that she had the authority to transfer a detainee to the hospital without a doctor's order where a detainee had urgent need for hospitalization,

    b.     adopted a policy delegating to HPL the sole permission to transfer a detainee regardless of the circumstances of the detainee's need for medical care and even though they knew it was HPL's policy to only transfer a detainee whose life or limb was in immediate jeopardy;

    c.     entered into a contract with HPL granting HPL perverse financial incentives which penalized HPL for engaging in medically appropriate transfers and at the same time failing to require that HPL transfer detainees to the hospital who had urgent medical needs which could not be met at the Sangamon County Jail.

66.     As a direct and proximate result of one or more of the foregoing acts or omissions, Lee Anne Brauer, R.N. was under the misapprehension that she had no authority to transfer Maurice Burris to a local hospital before 11:00 a.m on December 4th, 2007.

67.     That as a direct and proximate result of adopting one or more of the foregoing policies, Lee Anne Brauer, RN, did not call for an ambulance until Maurice Burris was on the cusp of cardiac arrest and beyond the point of receiving any effective medical treatment and Maurice Burris's perforated duodenal ulcer went undiagnosed and untreated resulting in massive peritonitis, cardiac

arrest and death on December 12th, 2007.

68.     That as a direct and proximate result of the acts set forth in paragraph 65 above,

Maurice Burris suffered excruciating pain prior to his death and after his death his next of kin have

lost the services, earnings, society and companionship of their father and the estate of Maurice Burris

has become liable for funeral and burial expenses and medical expenses which were incurred after

Maurice Burris was belatedly transferred to Saint John's Hospital.

WHEREFORE, Plaintiff JACOB BURRIS, as Administrator of the Estate of MAURICE L.

BURRIS, deceased, requests judgment against the Defendants NEIL WILLIAMSON, Sheriff of

Sangamon County, in his personal and official capacity, TERRY DURR, Superintendent of

Sangamon County, SANGAMON COUNTY SHERIFF'S DEPARTMENT, and SANGAMON

COUNTY in an amount which is sufficient to compensate the Estate of Maurice Burris, and the next

of kin for their loss, punitive damages, and attorneys' fees and costs pursuant to 42 USC § 1988.

**PLAINTIFF DEMANDS TRIAL BY JURY**

By:      /s/Alexandra de Saint Phalle
       ALEXANDRA de SAINT PHALLE:  Bar Number: 0620815
       Attorney for Plaintiff
       LONDRIGAN, POTTER & RANDLE, P.C.
       1227 South Seventh Street
       Post Office Box 399
       Springfield, IL 62703
       Telephone: (217) 544-9823
       alex@lprpc.com

**ALEXANDRA de SAINT PHALLE**
**LONDRIGAN, POTTER & RANDLE, P.C.**
**1227 South Seventh Street**
**Post Office Box 399**
**Springfield, IL 62703**
**Telephone: (217) 544-9823**
**alex@lprpc.com**

**JOSEPH J. MADONIA**
**JOSEPH J. MADONIA & ASSOCIATES**
**5757 North Sheridan, Suite 10A**
**Chicago, IL 60660**
**Telephone: (312) 464-9000**
**joemadonia@aol.com**