# EXHIBIT K

# TERRY DURR DEPOSITION JUNE 5, 2010

130157877v1  0884944  13302

```
 1   unwritten policies as to how necessary medical care
 2   was to be delivered to inmates?
 3        A.   Yes, I'm familiar with that.
 4        Q.   And how did you gain that familiarity?
 5        A.   By the policy, by studying the policies or
 6   reading them back at the time.
 7        Q.   In December of 2007, was it the policy of
 8   the Sangamon County Jail to have medical care
 9   available for emergencies on a 24-hour basis?
10        A.   Yes.
11        Q.   Was it also the policy of the Sangamon
12   County Jail to provide inmates with treatment for
13   any and all emergency needs in a timely manner?
14        A.   Yes.
15        Q.   In the Burris case that was filed in state
16   court, did you assist in providing Neil Williamson
17   with answers to interrogatories?
18        A.   I don't recall if I did or didn't.
19        Q.   Okay.  Now I'm going to refer you to some
20   documents here to help refresh your recollection
21   because this is not a memory contest.
22        A.   Okay.
23        Q.   If are there any documents here that will
24   help you refresh your recollection, feel free to
```

```
1       A.   Okay.
2       Q.   All right.  Is answer to Interrogatory 15
3  one of the interrogatories you helped provide your
4  attorneys with information?
5       A.   I'm not sure if it was or if it was -- if
6  I did or didn't on that one specific one.
7       Q.   Well, let me --
8       A.   I know -- pardon me.
9       Q.   Go ahead.
10      A.   No, that's okay.
11      Q.   As superintendent of the Sangamon County
12 Jail, can you indicate whether the answer that is
13 provided is correct to the best of your knowledge?
14           MR. RAMAGE:  I'm going to object.
15 Foundation, lack of personal knowledge.  He said he
16 doesn't remember and these have already been sworn
17 to by the Sheriff.  They are admissions, so you can
18 go ahead and answer if you can.
19      A.   What was the question again.
20 BY MS. de SAINT PHALLE:
21      Q.   Based on your position as superintendent
22 of the Sangamon County Jail, does it appear that
23 the answer to Interrogatory Number 15 is accurate?
24           MR. RAMAGE:  Same objection.
```

TERRY DURR  6/15/2010

Page 15

1   A.   Yes. The policy at the jail was if the
2   nurses saw something that they knew needed to be
3   sent out to the hospital, they sent them out, and
4   they referred to the doctors other than that if
5   they weren't sure whether they needed to be sent
6   out or not.
7   BY MS. de SAINT PHALLE:
8   Q.   Okay. Now was that the policy that was in
9   place prior to December 1st of 2007?
10  A.   Yes.
11  Q.   Did that policy change after December 1st
12  of 2007?
13  A.   No. The continuation of the policy was
14  that our policy was if they didn't see -- if it was
15  not clear to them what was going on with the
16  inmate, they would contact the doctor to get a
17  referral to see if they needed to send them to the
18  hospital.
19       If it was clear, you know, to the
20  nurses, the nursing staff, that this person needed
21  to be taken to the hospital, they would take them
22  to the hospital and then contact the doctors.
23  Q.   Now, if you look at Page 191.
24  A.   Okay.

1  allowed under federal rules, and my question is
2  asking what his understanding is.
3          MS. POWELL: That's a different question.
4  That's fine.
5          MS. de SAINT PHALLE: That's what I asked
6  him.
7      A.   My understanding of this paragraph was
8  that this was a contract cost that they put in
9  there to try to control the cost of hospitalization
10 in the contract.  That was my understanding of this
11 $50,000.  Our procedures on sending people to the
12 hospital were still the same.
13 BY MS. de SAINT PHALLE:
14     Q.   Were you involved at all in the decision
15 to retain HPL?
16     A.   No.
17     Q.   Who was, to your knowledge?
18     A.   I think the contract negotiations were
19 coming from Don Barber and I think the County Board
20 had told him to find a different medical provider
21 is my understanding of what transpired.
22     Q.   Do you know why the County Board told Don
23 Barber to find a different medical provider?
24     A.   Because I believe that Dr. Maurer and

 1  $50,000 of expense was discussed at this jail
 2  committee meeting?
 3      A.  I don't believe it was.  I don't see
 4  anything in the notes that says it was discussed.
 5      Q.  Take a look at the document which is
 6  marked as Claus Exhibit 2 in this book and I want
 7  to refer you to Page 138 and 139.  Page 138 of
 8  Claus Deposition Exhibit 2 refers to there is an
 9  e-mail there that indicates that Dale Claus of HPL
10  is requesting that a contract be drafted, and then
11  I want to refer you to Page 139 which indicates
12  that you were the contract contact person.  You see
13  your name listed there?
14      A.  Yes, yes.
15      Q.  Do you know why you were regarded as the
16  contract contact person?
17      A.  Maybe the only -- I do not know why it was
18  listed as that.  I do not know.
19      Q.  Do you recall whether you were ever
20  consulted in the process of coming up with the
21  final contract language?
22      A.  Not with the final contract language, no.
23      Q.  Do you recall being consulted at any time
24  between, let's see, November 7th of '07 and

```
 1    December 1st regarding the contract language?
 2              MR. RAMAGE:  Asked and answered earlier.
 3    Go ahead.
 4        A.   With who?
 5    BY MS. de SAINT PHALLE:
 6        Q.   By any representative of HPL?
 7        A.   Not that I remember.
 8        Q.   To your knowledge in the eight month
 9    period that, eight or nine month period that HPL
10    was rendering services, did they ever provide
11    healthcare training to any of the correctional
12    officers?
13        A.   I'm not sure if they did an orientation or
14    if they did training before they started.
15        Q.   Were you ever given any of the HPL
16    healthcare policies and protocols?
17        A.   I was not.  I think they went directly to
18    Lee Anne.
19        Q.   Did Lee Anne ever tell you that she had
20    received those policy protocols?
21        A.   I don't recall her telling me whether she
22    had or hadn't received them.
23        Q.   Take a look in this exhibit, Dale Claus
24    Deposition Exhibit 1, Part 2, Page 122 on the
```

```
 1      A.   Not in this document.
 2      Q.   So you would agree if people are
 3 contacting her first, that's a Sangamon County Jail
 4 policy, not an HPL policy?
 5      A.   Correct, but they did contact the doctor
 6 directly on occasion instead of Lee Anne so.
 7      Q.   Okay.  Did you ever personally see
 8 Mr. Burris before December 4th of 2007?
 9      A.   No.
10      Q.   And did you provide any medical attention
11 to him yourself even on December 4, 2007?
12      A.   No.
13      Q.   Did you ever have a conversation with
14 Dr. Cullinan about Mr. Burris before December 4,
15 2007?
16      A.   No.
17      Q.   Did any of the correctional officers ever
18 come to you asking questions about Mr. Burris's
19 medical care before December 4, 2007?
20      A.   No.
21      Q.   Did Lee Anne Burris (sic) ever come to you
22 about Mr. Burris before December 4, 2007?
23      A.   Lee Anne Brauer?
24      Q.   Lee Anne Brauer, I'm sorry.
```